NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AUTHENTIC TITLE SERVICES, INC.,

*Plaintiff*,

v.

GREENWICH INSURANCE COMPANY,
WESTERN LITIGATION, AMERICAN
INSURANCE PROFESSIONALS INC., AND
JOHN DOES 1-10,

*Defendants*.

Civil No.: 18-4131 (KSH) (CLW)

OPINION

**Katharine S. Hayden, U.S.D.J.**

I.      Introduction

In this insurance coverage dispute, plaintiff Authentic Title Services, Inc. seeks coverage

under its errors and omissions policy with defendant Greenwich Insurance Company for losses

relating to an email spoofing scheme in which Authentic was duped into sending real estate loan

proceeds to a fraudulent account.  The parties have filed cross-motions for summary judgment.

For the reasons set forth below, summary judgment will be granted in favor of Greenwich.

II.      Background

The relevant facts are undisputed.  Authentic is an agent for title insurance policies

underwritten by Fidelity National Title Insurance Company.  (D.E. 46-3, Pls.' 56.1 Stmt. in

Response ¶ 1.)  Its president is Mark Maryanski, a licensed attorney who is also the company's

only full-time employee.  (*Id.* ¶¶ 2-3.)  Greenwich insured Authentic under a Title Professional

Liability Errors and Omissions insurance policy for the period of May 25, 2015 to May 25, 2016.

(*Id.* ¶ 6.)

In March and April 2016, Authentic acted as title agent and settlement agent for a real estate transaction for a property in South Orange, New Jersey. (*Id.* ¶ 29.) Quicken Loans was the mortgage lender, and it and transferred the loan proceeds to Authentic on March 30, 2016, the day before the originally scheduled closing date. (*Id.* ¶¶ 31-32.) Authentic deposited the funds into a settlement account at TD Bank. (*Id.* ¶ 33.) Although they had been deposited into Authentic's settlement account, the funds remained the property of Quicken. (*Id.* ¶ 35.) The closing was postponed, and emails ensued between Authentic's Maryanski and Quicken's Brittany Clark and others concerning return wire instructions for Authentic to use in sending the loan proceeds back. (*Id.* ¶¶ 37-42.)

On April 4, 2016, Maryanski received an email from "BrittanyClork@quickenloans.com" (an email address different from Clark's legitimate email address by one letter), with what appeared to be wiring instructions for the return of the funds. (*Id.* ¶¶ 43-45.) The email was actually from an unknown third party posing as Clark, and it directed Maryanski to transfer the funds to a specified account at Chase Bank (the "Fraudulent Account") and to confirm only by email. (*Id.* ¶¶ 43, 46.) The email also copied two spoofed email addresses that were very similar to legitimate email addresses used by other Quicken employees involved with the real estate transaction. (*Id.* ¶ 47.)

On April 5, 2016, Maryanski received an email from yet another spoofed email address, purporting to be from yet another Quicken employee, Aloria Harris, and which was one letter off from her legitimate email address. (*Id.* ¶ 48.) The email again requested that Maryanski wire the funds to the Fraudulent Account. (*Id.*) That same day, Maryanski transferred the Quicken loan proceeds of $480,750.96 to the Fraudulent Account. (*Id.* ¶ 49.) He sent email confirmation to the spoofed email address for Ms. Harris, and received an acknowledgement in response from

2

what the parties refer to as the "fraudster."  (*Id.* ¶¶ 51-52.)

By April 12, 2016, it became clear to both Maryanski and Quicken that the funds had

been diverted to the Fraudulent Account.  (*Id.* ¶¶ 53-55.)  Around April 14, 2016, Maryanski

reported the incident to Authentic's bank, TD Bank.  (*Id.* ¶ 56.)  He also reported it to Fidelity,

which issued title insurance for the real estate transaction, to the FBI, and to JP Morgan Chase

Bank.  (*Id.* ¶¶ 56-59.)  The diverted funds were withdrawn by an unknown party and never

recovered.  (*Id.* ¶¶ 60, 62.)

Maryanski filed a claim with Greenwich on April 18, 2016.  (*Id.* ¶¶ 9, 63.)  Receipt was

acknowledged on April 21, 2016.  (*Id.* ¶ 68.)  Quicken was indemnified by Fidelity for the loss

and provided new funds for the transaction, which closed.  (*Id.* ¶¶ 70-71.)

On May 3, 2016, Fidelity contacted Greenwich, copying Maryanski, advising it of the

claim it received from Quicken and that it had retained legal counsel to pursue the funds, and

asserting a claim against Authentic for which it requested immediate payment.  (*Id.* ¶¶ 72-73.)

The next day, Greenwich notified Authentic that it was denying the claim.  (*Id.* ¶ 74.)  In that

May 4, 2016 letter, Greenwich invoked an exclusion providing that the policy did not apply to

any claim:

> 14. based on or arising out of:
>
> a. the commingling, improper use, theft, stealing, conversion, embezzlement or misappropriation of funds or accounts[.]

(*Id.* ¶ 74; D.E. 45-4, Seery Decl. ¶ 14 & Ex. L at 3-4.)  The letter continued:

> This claim arises from a theft, stealing, conversion and/or misappropriation of funds.  As such, the claim is not covered by the policy as it arises from conduct clearly excluded under this Policy. Consequently, [Greenwich] is therefore denying defense and indemnity coverage for this matter.

(*Id.* at 4.) Under a heading entitled "Additional Coverage Issues," the letter went on to refer to

3

several additional exclusions, the first excluding coverage for any claim

> 8. based on or arising out of alleged criminal, intentionally wrongful, fraudulent or malicious acts or omissions. However, this exclusion shall not apply to **defense expenses** or the **Company's** duty to defend a **claim** unless and until there is an admission by, finding of fact, or final adjudication against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Company** for all **defense expense** incurred.
>
> Additionally, this exclusion will not apply to any Insured who:
>
> a.      did not participate or acquiesce in such act, error or omission;
>
> b.      had no knowledge of or reason to suspect such an act, error or omission; and
>
> c.      immediately notified **the Company** in writing after obtaining knowledge of such act, error or omission.

(*Id.*)[1]  Greenwich then stated it "reserve[d] its right to deny defense and indemnity coverage for this matter in its entirety" to the extent any insured "may be involved in any criminal, intentionally wrongful, fraudulent or malicious act or omission." (*Id.*)[2]  Greenwich also stated it "reserve[d] its rights to deny defense and indemnity coverage for this matter in its entirety based on the foregoing exclusions." (*Id.* at 5.)

In a July 25, 2016 letter to Greenwich, Authentic's counsel challenged the denial of coverage and Greenwich's interpretation of the policy. (Pls.' 56.1 Stmt. in Response ¶ 75 & Seery Decl. Ex. M.)  Greenwich reiterated its coverage denial in an August 5, 2016 letter. (Pls.' 56.1 Stmt. in Response ¶ 76.)

---

[1] Bolded terms are defined in the policy.

[2] The letter also stated that the policy did not apply to any claim "based on or arising out of the intentional or willful breach or disregard of any oral or written underwriting or binding authority," or "based on or arising out of the intentional or willful failure to follow any escrow or closing instructions, or out of the intentional or wilful [sic] disregard of any escrow or closing instructions." (*Id.* at 4-5.)  Neither party relies on these provisions in seeking summary judgment, and they are not relevant to resolving the dispute before the Court.

On March 27, 2017, Fidelity demanded payment directly from Authentic in the amount of $520,107.87.  (*Id.* ¶¶ 77-78 & Seery Decl. Ex. O.)  It has not filed suit against Authentic for payment.  (Pls.' 56.1 Stmt. in Response ¶ 80.)  On June 28, 2017, Authentic's counsel again wrote to Greenwich to demand coverage for the Fidelity claim; Greenwich reiterated its denial on July 18, 2017.  (*Id.* ¶¶ 81-82.)

On February 26, 2018, Authentic filed suit in Essex County Superior Court against Greenwich, along with Western Litigation, Inc., which Authentic alleged was Greenwich's counsel, and American Insurance Professionals, LLC ("AIP"), Authentic's insurance broker.  (D.E. 1-2, Compl.)[3]  Authentic's complaint sought coverage from Greenwich for Fidelity's claim (count 1), and asserted claims against Greenwich for breach of the duty of good faith and fair dealing (count 2), breach of contract for denying coverage (count 3) and for denying Authentic legal representation (count 4), negligence for failing to participate in the claims negotiation process (count 5), and breach of fiduciary duty for failing to advise Authentic of the availability of additional coverage for cyber fraud (count 6).  Authentic also asserted additional claims for negligence and malpractice (counts 7 and 8), and breach of fiduciary duty (count 9).   Western Litigation removed the action to this Court on March 23, 2018, on the basis of diversity jurisdiction.  (D.E. 1.)  Authentic subsequently dismissed its claims against Western Litigation and AIP.  (D.E. 16, 35.)  It also dismissed the claims in counts 2, 5, 6, 7, 8, and 9 against Greenwich, leaving only counts 1, 3, and 4 remaining for disposition.  (D.E. 17.)  Thus, all that remains for disposition are Authentic's claims against Greenwich seeking a declaration of

---

[3] The complaint also named ten unidentified John Does.  As discovery is closed, these fictitious defendants will be dismissed.  *Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250-51 (3d Cir. 2009); Fed. R. Civ. P. 21.

coverage and for breach of contract for denying it coverage and legal representation.  Greenwich

answered on July 25, 2018.  (D.E. 18.)

Greenwich has now moved for summary judgment, relying on exclusion 14(a) of the

policy, which, as noted earlier, excludes from coverage claims "based on or arising out of . . . the

commingling, improper use, theft, stealing, conversion, embezzlement or misappropriation of

funds or accounts."  (D.E. 45-3, Def.'s Moving Br. 4-5, 11; *see also* D.E. 50, Def.'s Reply Br.)

Greenwich also relies on the policy's definition of "damages" as excluding "the loss of or

unauthorized removal of funds" from the insured's account.  (*Id.* at 11-12.)  Authentic has

opposed Greenwich's motion and also cross-moves for summary judgment in its favor, arguing

that a different exclusion, exclusion 8, is the more appropriate one on the facts, and because it

doesn't apply, Greenwich is required to provide coverage for the claim.  (*See* D.E. 46-1, Pl.'s

Opp. Br.)  Authentic further argues that Greenwich's proposed interpretation of section 14(a)

would render the policy ambiguous and illusory, and that that ambiguity should be resolved in its

favor.

## III.   Standard of Review

### A.  Summary Judgment Standard

Summary judgment is proper where the movant demonstrates that there is no genuine

dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a).  In ruling on the motion, the Court views the evidence in the light most favorable to the

nonmoving party and draws all inferences in favor of that party.  *Auto-Owners Ins. Co. v. Stevens*

*& Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016).  A factual dispute is "genuine" if the evidence

would permit a reasonable jury to find for the non-movant.  *Jutrowski v. Twp. of Riverdale*, 904

F.3d 280, 289 (3d Cir. 2018).  A fact is "material" if it "might affect the outcome of the suit

under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). At the summary judgment stage, the Court is not permitted to make credibility determinations or weigh the evidence. *Id.* at 428-29.

The same standard applies when cross-motions for summary judgment are filed. *Id.* "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)). Cross-motions for summary judgment are a particularly appropriate vehicle for deciding insurance coverage disputes such as this one, in which the parties do not contest the basic facts underlying the dispute. *See Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 510 (D.N.J. 2008) (Simandle, J.) ("Under New Jersey law, '[t]he interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary judgment.'" (citation omitted)), *aff'd*, 352 Fed. App'x 642 (3d Cir. 2009).

## B. Interpretation of Insurance Policies

"An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010).[4] Policy language is interpreted "according to its plain and ordinary meaning." *Id.* (citation and internal quotation marks omitted). Terms that are not clear, but ambiguous, are construed in favor of the insured and against the insurer. *Id.* "If the language is clear, that is the end of the inquiry." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238

---

[4] There is no dispute that New Jersey law governs.

(2008).  "[I]n the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased."  *Id.* (citation omitted); *see also Flomerfelt*, 202 N.J. at 441.  "If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists," and in that event, "a court may look to extrinsic evidence as an aid to interpretation."  *Chubb*, 195 N.J. at 238.

Generally, policy exclusions are narrowly construed, and it is the insurer's burden to "bring the case within the exclusion."  *Flomerfelt*, 202 N.J. at 442 (citation and internal quotation marks omitted).  "[I]f there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it."  *Id.*  But "far-fetched interpretation[s]" do not create ambiguity, and "courts must be careful not to disregard the 'clear import and intent' of a policy's exclusion."  *Id.*  "Rather, courts must evaluate whether, utilizing a 'fair interpretation' of the language, it is ambiguous."  *Id.*

IV.     **Discussion**

The parties do not dispute the key facts; accordingly, the question before the Court on these cross-motions is whether either party is entitled to judgment as a matter of law.  Answering that question begins with the language of the policy, which provides for coverage as follows:

> **B. WHAT IS COVERED**
>
> Subject to all terms and conditions of this policy, the **Company** will pay on the **Insured's** behalf **damages** and **defense expenses** arising out of a **claim** first made against the **Insured** during the **policy period**, and reported to the **Company** in writing during the **policy period**, by reason of an actual or alleged negligent act or omission or **personal injury**, in the performance of **professional services** that are alleged to have occurred on or after the **retroactive date** of this policy.

(Seery Decl., Ex. B, Policy § B.)  The policy defines the term "Damages" as "a monetary judgment or monetary award which the **Insured** is legally obligated to pay . . . . However,

8

**damages** do not include . . . g. the loss of or unauthorized removal of funds from any **Insured's** account."  (Policy § A.4.)

Among the "terms and conditions" of the policy is a series of exclusions, including exclusion 14(a), which provides as follows:

This insurance does not apply to any **claim**:

. . .

14. based on or arising out of:

a.   the commingling, improper use, theft, stealing, conversion, embezzlement or misappropriation of funds or accounts;

b.   sums received by any **Insured** or credited to any **Insured's** account; or

c.   fees, premium, taxes, **claims**, commissions or brokerage monies.

(Policy § H.14.)

Greenwich contends, and the Court agrees, that exclusion 14(a) directly addresses the factual scenario here.  The exclusion's plain language – the indisputable starting point for the Court's analysis under New Jersey law – states that no coverage is provided for claims "based on or arising out of" the theft, stealing, conversion, or misappropriation of funds.  The New Jersey Supreme Court has defined the phrase "arising out of" to mean "originating from, growing out of or having a substantial nexus." *Flomerfelt*, 202 N.J. at 454 (citation and internal quotation marks omitted); *see also Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 N.J. 29, 35-36 (1998).  Fidelity's claim against Authentic and Authentic's consequent claim for coverage under its policy with Greenwich undeniably originated from, grew out of, or had a substantial nexus to funds belonging to Quicken that were transferred into the Fraudulent Account and then were withdrawn by a person or entity other than Quicken and were never recovered.

9

The parties' debate is with whether that scenario involved the "theft," "stealing," "conversion," or "misappropriation" of Quicken's funds.  Greenwich argues that these are clear terms that involve wrongfully depriving another of its property, which happened here.  Conversion, for example, is defined as the "wrongful exercise of dominion and control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456 (App. Div. 2009).  "Misappropriation" involves the "application of another's property or money dishonestly to one's own use."  Black's Law Dictionary (11th ed. 2019).  "Theft" is commonly defined as "the wrongful taking and removing of another's personal property with the intent of depriving the true owner of it."  Black's Law Dictionary (11th ed. 2019).  So construed, the terms undoubtedly apply to the Quicken funds that Maryanski erroneously sent to the fraudulent account; it does not matter, in other words, who committed the theft or other prohibited act, the insured or another party; if the claim arose from such an act (and it cannot reasonably be disputed that it did), the plain and ordinary meaning of the language in exclusion 14(a) supports Greenwich's denial of coverage.

Authentic argues that the terms theft, stealing, misappropriation, and conversion are ambiguous because they could be interpreted to include conduct by both the insured and by third parties, and that because they are ambiguous, they must be interpreted in favor of it, the insured, and against Greenwich, the insurer.  In this context, that means interpreting the terms to reach only conduct by the insured, and not by other actors.  Adopting this argument would, of course, result in exclusion 14(a) not applying to the spoofing incident involving Authentic's loss of the Quicken funds.

10

The Court declines to do so.  Although Authentic is correct that ambiguous terms are to be construed in favor of the insured, *see Flomerfelt*, 202 N.J. at 441, these terms are not ambiguous.  Authentic's argument to the contrary relies on several unpersuasive premises.  First, it is based on a faulty application of the interpretive maxim *noscitur a sociis*, which provides that a general term is given a more restrictive meaning by virtue of its association with more specific terms.  *See Sealed Air Corp. v. Royal Indem. Co.*, 404 N.J. Super. 363, 380-81 (App. Div. 2008) (explaining *noscitur a sociis* to mean that "'a word is known from its associates. Words of general and specific import take color from each other when associated together, and thus the word of general significance is modified by its associates of restricted sense.'" (quoting *Bertrand v. Jones*, 58 N.J. Super. 273, 283, 156 (App. Div. 1959)).  That is not what Authentic has proposed; instead, it contends some of the terms (theft, stealing, misappropriation, and conversion) are capable of reaching first- and third-party conduct, while others (commingling, improper use, and embezzlement) reach only first-party conduct.  To make the policy clear, Authentic posits, all of the terms should be interpreted as applying to only to first-party conduct; *i.e.*, conduct by the insured.  As explained above, *noscitur a sociis* calls for using the more specific to circumscribe the more general, not simply slotting terms into definitional groups and picking one.

Moreover, as the New Jersey Supreme Court has explained, "'[a] genuine ambiguity arises only where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" *Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.*, 206 N.J. 596, 608 (2011) (quoting *Progressive Cas. Ins. Co. v. Hurley*, 166 N.J. 260, 274 (2001)).  One need look no further than Maryanski's own report of the potential claim to Greenwich to see that the term

11

"misappropriation," for example, has a clearly understood meaning that includes third-party conduct. (*See* Pls.' 56.1 Stmt. in Response ¶ 65 (excerpting claim report in which Maryanski describes potential claim as "involving misappropriated wire funds").)  The terminology in exclusion 14(a) is clear as written; it is Authentic's proposed interpretation, which would engraft a limitation absent from the text, that would introduce confusion, and the Court declines the invitation to rewrite the policy in this manner.  *See id.* ("If the policy terms are clear, we interpret the policy as written and avoid writing a better insurance policy than the one purchased.").

Authentic also attempts to depict exclusion 14(a) as ambiguous, and therefore subject to an interpretation that favors it over the insurer, by invoking the language of exclusion 8.  That provision states that the insurance policy does not apply to claims "based on or arising out of alleged criminal, intentionally wrongful, fraudulent or malicious acts or omissions," but exempts from the exclusion insureds who "did not participate in or acquiesce in such act, error or omission," had no knowledge or reason to suspect it, and immediately gave Greenwich written notice after learning of it.  (Policy § H.8.)   Authentic contends that this exclusion "provides" coverage to it in the event of a crime committed by someone other than the insured, and that interpreting exclusion 14(a) as Greenwich proposes would take away that coverage, placing the exclusions in "direct conflict" and rendering the policy "hopelessly ambiguous" and "illusory." (Pl.'s Opp. Br. 2-3.) As an initial matter, exclusion 8 does not "provide" coverage; if it does not apply, coverage is simply not excluded on the basis of the conditions specified in it.  The inapplicability of one exclusion does not negate the applicability of all other exclusions. (*See* Policy § B ("Subject to *all terms and conditions* of this policy, the Company will

pay . . . damages and defense expenses . . . .").)  *See also Weedo v. Stone-E-Brick, Inc.*,

81 N.J. 233, 247-48 (1979) ("exclusion clauses *subtract* from coverage rather than grant

it," and each exclusion is read independently of each other).

Moreover, Authentic's invitation to read exclusion 14(a) in the context of the policy as a

whole helps Greenwich's position rather than its own.  Authentic argues that exclusion 14(a)

must be read to reach only conduct by the insured.  But the language of other exclusions suggests

that when Greenwich intended that result, it expressly said so.  Exclusion 8, for example,

includes the carve-out language discussed above.  Exclusions 11, 15, and 16 also expressly refer

to conduct by the insured.  Exclusion 14(a) does not. As Greenwich argues, this indicates that the

company intended it to apply to conduct regardless of whether the insured was involved; in other

words, this is the intended result of the language, rather than an unintended ambiguity in it.  (*See*

Def.'s Reply Br. 7 ("[W]hat Authentic describes as ambiguity is, in fact, the only reasonable

interpretation of Exclusion 14 under the plain meaning of the language used.").)

Although neither party has pointed to an authoritative interpretation of the disputed

policy language under New Jersey law, and neither suggests that the Greenwich form is a

standardized one,[5] Greenwich has cited several decisions from other jurisdictions in which courts

were confronted with similar policy language and found it to be unambiguous and to reach third-

party conduct. In *Accounting Resources, Inc. v. Hiscox, Inc.*, 2016 WL 5844465, at *1 (D. Conn.

Sept. 30, 2016), for example, the district court, presented with policy language and arguments

markedly similar to those presently before this Court, concluded that a misappropriation-of-funds

---

[5] *See Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008) ("Although
not a canon of construction, courts frequently look to how other courts have interpreted the same
or similar language in standardized contracts to determine what the parties intended, especially
where rules in aid of interpretation fail to offer a clear result.")

exclusion unambiguously precluded coverage for a third party's misappropriation or theft of

funds using a spoofing scheme to dupe the vendor, a bookkeeping company, into paying

fraudulent invoices.  The policy provided that the insurer had "no obligation to pay any sums . . .

for any claim . . . based upon or arising out of the actual or alleged theft, misappropriation,

commingling, or conversion of any funds, monies, assets, or property."  *Id.* at *1.  The court

rejected the vendor's argument that this language only applies to conduct by parties other than

the insured or its employees, observing that "[t]he policy's wording says nothing about who must

engage in the theft or misappropriation of funds," and the "absence of limitation bespeaks

breadth."  *Id.* at *2.  The court found support for its conclusion, as this Court does here, in the

existence of a separate "intentional acts" exclusion that expressly limited its operation to acts of

the insured.  *See id.* at *3.  The language of that exclusion closely tracks the language of

exclusion 8 in the Greenwich policy.[6]

    In sum, the plain language of exclusion 14(a) dictates its applicability to the spoofing

scheme underlying this lawsuit.  Review of the exclusion in the context of the policy as a whole,

and paying particular attention to exclusion 8 given Authentic's heavy reliance on it, does not

change that conclusion.  *Hiscox* and other cases cited by Greenwich provide further support to

the Court's conclusion.  The language is not ambiguous,[7] and the Court rejects Authentic's

---

[6] Although the language of the "intentional acts" exclusion was not excerpted in the Connecticut district court's opinion, Greenwich has supplied the policy as an exhibit to its reply certification. (*See* D.E. 50-6, Ex. S to Seery Supp. Decl.)

[7] Although this result is consistent with Magistrate Judge Waldor's earlier ruling (D.E. 42) that the word "theft" in the exclusion is unambiguous, the Court does not rely on the law of the case doctrine to reach it.  (*Cf.* Def.'s Moving Br. 17.)  The question before Judge Waldor was far narrower, involved resolution of a discovery dispute, and did not implicate the merits.  *See, e.g.*, *Speeney v. Rutgers*, 369 F. App'x 357, 359-61 (3d Cir. 2010); *Krys v. Aaron*, 106 F. Supp. 3d 472, 480-81 (D.N.J. 2015) (Simandle, J.); *Lesende v. Borrero*, 2014 WL 4199095, at *4 (D.N.J. Aug. 22, 2014) (Debevoise, J.) (all discussing and declining to apply law of the case doctrine).

arguments to the contrary, including its resort to the doctrine of the insured's reasonable expectations[8] and its reliance on decisions that found ambiguity in policy language bearing no resemblance to the Greenwich policy before the Court.

Finally, Greenwich alternatively relies on the policy's definition of "damages" as a basis to deny coverage. As discussed above, the policy provides that, subject to the terms and conditions therein, Greenwich will pay certain "damages" and defense expenses; "damages" do not include "the loss of or unauthorized removal of funds" from the insured's account. (Policy §§ B, A.4.) In view of the clear applicability of exclusion 14(a), the Court declines to reach the issue of whether the transfer constituted a "loss" of the funds or whether it involved an "unauthorized" removal under these facts.

## V.     Conclusion

Greenwich's motion for summary judgment is granted, and Authentic's cross-motion for summary judgment is denied. An appropriate order will issue.

/s/ Katharine S. Hayden
Date: November 17, 2020                                    Katharine S. Hayden, U.S.D.J.

---

[8] *Oxford Realty Group Cedar v. Travelers Excess & Surplus Lines Co.*, 229 N.J. 196, 208 (2017) (doctrine applies when language is ambiguous, or terms and conditions are misleading)